Matter of Standup Harlem, Inc. (2003 NY Slip Op 51494(U))

[*1]

Matter of Standup Harlem, Inc.

2003 NY Slip Op 51494(U)

Decided on October 16, 2003

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 16, 2003

Supreme Court, New York County
In the Matter of the Application of STANDUP HARLEM, INC. For an order approving the transfer of 162 West 130th St., New York, New York to Housing Works Harlem Housing Development Corporation pursuant to Sections 509, 510 and 511 of the Not-For-Profit Corporation Law.
Index No. 104071/03

Lottie E. Wilkins, J.
DECISION
StandUp Harlem, Inc. has petitioned the Court pursuant to Not-For-Profit Corporation Law §§ 510 and 511 for approval to sell the premises located at 162 West 130th Street in Manhattan to non-party Housing Works Harlem Housing Development Fund Corp. The intervenor, West 130th Street Homeowners and Property Owners Association, opposes the petition and urges the Court not to approve the sale. This matter came before the Court for hearing on July 2, 2003. As framed by the Court, the issue to be determined was whether the SUH board of directors that approved the sale of the property in May 1999 was properly constituted and thus acted with authority. Also present at the hearing was counsel for the New York State Attorney General's office, Charities Bureau.
Like many areas in Harlem, the West 130th Street community has undergone a rejuvenation in recent years. Where this was once a block of dilapidated and abandoned buildings with few occupied homes, it is now an area of multi-cultural homeowners striving to build a safe and clean community marked by pride. This community is also unique in that it has aggressively and actively used the political, administrative and police processes to insure that it continues to move into its bright future. The show of support on both sides of this issue testifies to the determination of the community, both homeowners and others, to insure that each of its members is committed to its continued growth and success.
In the context of the proceeding before it, however, this Court is not the place to re-examine policy decisions previously made to place a residential HIV/AIDS facility on West 130th Street. Rather, as the decision more fully explains, the Court's obligation here is strictly to assure the community that the requirements of the Not-For-Profit Corporation Law have been complied with when the sale of property such as this is contemplated.
I
[*2]Parties Involved
StandUp Harlem, Inc. (SUH) was incorporated in 1991 as a Type B not-for-profit corporation pursuant to Not-For-Profit Corporation Law § 201.[FN1] As stated in its certificate of incorporation and by-laws, the purpose of SUH was to give hope and empowerment to people living with HIV and AIDS. In order to achieve that goal, one of the specific functions of SUH was the provision of transitional and long-term housing for the homeless and/or drug addicted members of the Harlem HIV/AIDS community. Eventually SUH came to operate out of four properties.[FN2] After several years of operation, the organization began to run into financial and administrative difficulties and, by 1997, had essentially ceased to operate. In 1999, after selling most of its other assets, SUH sought authorization from the Attorney General and the Court, as required by Not-For-Profit Corporation Law §§ 510 and 511, to sell its last remaining asset, the property located at 162 West 130 th Street ("the property").
The West 130th Street Homeowners and Property Owners Association ("Homeowners Association") is an unincorporated organization opposed to the sale. The Homeowners Association was notified in advance of the sale, as required by the Attorney General, and has intervened to block the transaction.[FN3] Through its president, Regina Smith, the Homeowners Association claims that the intended purchaser of the property, Housing Works Harlem Housing Development Fund Corp. ("Housing Works"), exerted undue influence over the SUH membership and board of directors to sell the property. Specifically, the Homeowners Association argues that the board of directors that passed the resolution to sell the property was improperly constituted as a result of Housing Works' interference and therefore lacked authority to authorize the sale. In a separate vein, the Homeowners Association asserts that the property has been a threat to public health and safety ever since SUH came into possession in 1992 and will continue to be one should Housing Works take over.
The intended purchaser, Housing Works, is likewise a not-for-profit corporation dedicated to serving the Harlem HIV/AIDS community. As a condition of sale, Housing Works committed to continue using the property in service to that same community. Significantly to the issues in this case, Housing Works' co-executive director, Charles King, was appointed president of SUH in May 1999 and, by virtue of that office, held a seat on the same SUH board of directors that ultimately approved the sale of the property to Housing Works.
[*3]Corporate Structure of SUH
In order to fully appreciate the Homeowners Association's objections, some understanding of the provisions in the SUH by-laws pertaining to members, directors and officers is necessary. With respect to members, article III of the SUH by-laws in effect prior to May 27, 1999, stated that membership in SUH was earned through commitment to the service ideals of the corporation. Specifically, members were required to make a three-month commitment to the HIV-supportive community and to perform a given responsibility assigned by SUH. Such responsibilities might include building maintenance, cleaning, fund-raising, coalition building, etc. In addition to regular quarterly meetings, the SUH by-laws provided that an annual membership meeting was to be held on the first day of April each year wherein a board of directors was to be elected.
Article IV of the SUH by-laws pertaining to its board of directors provided that a director was to be elected to a one-year term by the membership at their annual meeting and to hold office "until the expiration of the term for which he was elected and until his successor has been elected and shall have qualified, or until his prior resignation or removal" (see also N-PCL § 703[b]). A quorum of the board consisted of at least three directors. Article IV also stated that directors could be removed "with cause" by vote of the membership, or "without cause" by vote of the board. For the purposes of filling vacancies on the board, the by-laws provided that a vacancy created for any reason other than removal without cause could be filled by majority vote of the board. Vacancies created by removal from the board without cause required a vote of the membership. The same article also stated that the president of SUH was an ex-officio voting member of the board.
Lastly, article VI of the by-laws, relating to the election and duties of officers of the corporation provided that the president of SUH be elected to a two-year term by vote of the membership. This article also stated that the president had to be a member in good standing.
II
Decline of SUH
Testimony at the hearing revealed that, in day-to-day application of the foregoing provisions, the membership of SUH was comprised mainly of individuals residing in SUH facilities, along with a smaller number of non-residents who earned member status by making a commitment to SUH and taking on responsibilities in connection with that commitment, as provided in the by-laws. Notably, neither the certificate of incorporation nor the by-laws contained specific provisions for the expiration or revocation of membership.
By the late 1990's SUH began to falter. As relevant here, the organization suffered an attrition of its membership and a breakdown in corporate governance. According to Louis Jones, former president of SUH, the last membership meeting that included anyone other than himself occurred in 1997. The testimony of Mr. Jones was also that, prior to May 1999, the last board of directors meeting was held in 1997. All parties agree that, by May 1999, SUH effectively ceased to operate as an organization. Likewise, there is no serious dispute that SUH also encountered serious financial difficulties during the same period. According to Mr. Jones, by the spring of 1999, all of the SUH properties, including 162 West 130th Street, were facing [*4]foreclosure by their creditors.
Dissolution of SUH
In an effort to retain certain government funding awarded to SUH, Mr. Jones began to explore the possibility of transferring the corporation's assets to other not-for-profit organizations that would carry out the organizational goals of SUH. With respect to 162 West 130th Street, Mr. Jones entered into discussions with Charles King, co- executive director of Housing Works, concerning the transfer of the property in exchange for Housing Works' assumption of SUH's debt on the property. Additionally, Housing Works was to make a commitment to continue using the property to serve the Harlem HIV/AIDS community.
With the assistance of Charles King and longtime SUH counsel Sue Ross, Mr. Jones caused letters to be drafted to the directors who had served on the board at its last meeting in 1997.[FN4] In the letters, dated May 17, 1999, Mr. Jones wrote that since the board had not met in over a year, he was attempting to ascertain the intentions of the 1997 directors with respect to their continued involvement with SUH. Two response forms were enclosed with the letter, one stating that the recipient intended to continue serving as a director, the other stating that the director resigned from the board. The packet also included a pre-paid return envelope addressed to Mr. Jones, care of the Housing Works office in New York City.[FN5] The letters were intended for five recipients, although only three had mailing addresses printed on them. Mr. Jones testified that all the letters were sent to the 1997 directors.
What followed in the final days of May 1999 is recounted in the minutes and resolutions of the various membership and board of director meetings that took place. On May 23, 1999, Mr. Jones, acting as the sole remaining member of SUH, convened a membership meeting. At that meeting, the membership (i.e., Mr. Jones) accepted the resignations of director Cassandra Perry, submitted by "electronic document", and director Karen Washington, who purportedly tendered her resignation. The membership then removed director Cheryl James from the board, for cause, on account of a conflict created by Ms. Jones commencement of a loan foreclosure action against SUH. The membership also removed Doug Heilman and Charles Eaton for cause because they failed to respond to Mr. Jones' letter. Finally, the membership elected Joseph Turco and Joe Pressley to the board of directors.
On May 26, 1999, the membership (i.e., Mr. Jones) resolved that Karen Washington, who had previously been removed from the board based on her purported resignation, was now removed from the board for failing to respond to the letter concerning her intentions as a director. The membership then elected Charles King of Housing Works to the board of directors. The membership also amended the corporation's by-laws to provide, first, that the SUH board of directors would thereafter constitute the corporation's membership and, second, to remove the requirement that annual membership meetings take place on the first day of April. Most significantly, the membership approved a resolution authorizing the board to sell [*5]162 West 130th Street to Housing Works.
As his last official act on May 26, 1999, Louis Jones resigned his SUH presidency and his position on its board of directors. The resignation left Joseph Turco, Joe Pressley and Charles King as the remaining directors. As a result of Mr. Jones' earlier membership resolution amending the by-laws, this board also now constituted the membership of SUH.
On May 27, 1999, the new SUH board of directors convened a "special" meeting wherein a number of important resolutions were adopted. First, in accordance with the May 26 membership resolution, the by-laws were amended to make the board of directors the sole member of the corporation. Next, the membership resolutions concerning removal of Karen Washington, the amendment of the by-laws and the transfer of 162 W. 130th St. to Housing Works were officially recognized. Likewise, Mr. Jones' resignation was recognized. Charles King was also elected president of SUH by the board.[FN6] Then, in accordance with Mr. Jones final membership resolutions, the board resolved to sell the premises at 162 West 130th Street to Housing Works. Charles King did not vote on this particular resolution citing a conflict of interest as the co-executive director of Housing Works. By these actions, SUH committed to sell the property to Housing Works and thereby divest itself of its last remaining significant asset.
III
Analysis
As an initial matter, the intervenor's affidavit submitted on May 16, 2003 prior to the hearing consisted mainly of allegations concerning the dangerous effects of the SUH property on the West 130th Street community.[FN7] The affidavit also predicted that these conditions would continue if and when Housing Works takes over. The inevitable conclusion to be drawn from the Homeowners Association's early argument was that there should no longer be a treatment facility on the property. Claims of this nature, however, are far outside the scope of a proceeding pursuant to Not-For-Profit Corporation Law §§ 510 and 511. If past SUH ownership of the property caused a threat to public health and safety, then these were matters to be addressed by law enforcement and policy makers.[FN8] It is not within the powers of this Court and certainly not in this proceeding to make policy decisions concerning the appropriate placement of AIDS treatment facilities in New York City. Whether or not this type facility should continue to exist on West 130th Street is a policy question to be determined by other branches of [*6]government that "can take a broader view, * * * eliciting the views of the various segments of affected, critically interested communities, and investigating and anticipating the full impact" of their decisions (see Desiderio v Ochs, 100 NY2d 159, 174 [2003]).
With respect to the relevant issue, SUH objects to the Court's examination of the constitution of the membership and board of directors that voted to sell the property. According to petitioner, the scope of the Court's review in this proceeding is limited to the criteria listed in Not-For-Profit Corporation Law § 511(d). As such, petitioner contends that the only appropriate areas of inquiry are whether the terms of the transaction are fair and reasonable and whether the purposes of the corporation or the interests of its members are promoted by the sale (see e.g. Matter of Sculpture Center, Inc., 2001 NY Slip Op 40368 [U]). This objection fundamentally misconstrues the purpose of the Court's inquiry.
If, as the intervenor alleges, the resolutions to sell the property were the result of improperly constituted meetings of the membership or board of directors (or both) then, obviously, the purposes of the corporation and the interests of its members would not be served (see N-PCL § 511[d]). It can hardly be disputed that the interests of the members would not be promoted if the members were not given an opportunity to express their interests. Moreover, at least one other court has examined the propriety of voting procedures in order to carry out its responsibilities under Not-For-Profit Corporation Law §§ 510 and 511 (see Matter of National Council of Young Israel, NYLJ, Sept. 15, 2003, at 22, col 1 [James, J.]). Thus, contrary to petitioner's position, the inquiry here is directly within the ambit of Not-For-Profit Corporation Law § 511(d).
Although the Court initially framed the issue as whether the board of directors was properly constituted, it becomes clear after reviewing the testimony and submissions that resolution of this question requires an examination of the membership meetings. This is so because, under its by-laws, all relevant authority at SUH resided in its membership. It was the membership that removed the 1997 directors and elected a new board in 1999. It was also the membership that resolved to sell the property and dissolve the corporation resolutions that were later only ratified by the board of directors. Thus, if the membership resolutions were improperly obtained, then the election of the 1999 directors was invalid and the 1997 board remains in office (see N-PCL § 703[c]). Moreover, all the of the board activity that followed its re-constitution in 1999 would likewise be a nullity.
In fact, this is the very position that the intervenor now takes. In its post-hearing memorandum, the Homeowners Association argues that, although there were other members of SUH in May 1999, they were never notified of meetings or given an opportunity to attend. Put another way, the intervenor contends that Louis Jones was not the only member when he convened membership meetings, therefore, the resolutions Mr. Jones made as the self-proclaimed last remaining member were invalid. Thus, it is membership status that lies at the core this dispute.
As described by Mr. Jones, membership in SUH was informal concept. It did not require a monetary investment, payment of annual dues, or a donation. Membership in SUH was earned simply by making a three-month commitment and accepting an assignment in furtherance of that commitment. Additionally, there were no letters sent or cards issued to indicate that an individual had earned member status. At the hearing, Mr. Jones testified that there was not even [*7]a membership roll containing the names and addresses of members, although his testimony on this point was equivocal. When the Court inquired how members were accounted for, Mr. Jones responded that the process was informal and that members simply "knew who [they] were in relation to each other." Moreover, meetings were typically convened by word of mouth.
As already noted, there was no by-law or other rule concerning the termination of membership when a member decided they no longer wished to commit to SUH or failed to live up to their commitment. The intervenor exploits this ambiguity in the by-laws by identifying individuals, claimed to be members, who could have been notified of the 1999 meetings, but were not. Specifically, the intervenor claims that Paula Palmateer, David Kirk, Chuck Eaton, Cheryl James, Karen Washington and Cassandra Perry all were members who were not given an opportunity to participate at meetings. The first two individuals were founding incorporators of SUH, along with Mr. Jones, identified in the certificate of incorporation. The remaining four individuals were all directors in 1997 and, by virtue of their directorships, also members. The intervenor argues that because none of these individuals participated in membership meetings, the membership resolutions of 1999 were therefore invalid. Notably absent from this assertion is any showing that these individuals expressed or demonstrated any commitment to SUH after 1997. It is due to this omission that the intervenor's argument fails.
Acceptance of the intervenor's view that individuals who had not been active in SUH since 1997 (or earlier) nonetheless still had a right to participate in membership meetings leads to an absurd result. The intervenor is correct that there is no record that any of the people it has identified ever resigned or had their membership in SUH formally revoked, however, there was no evidence that any member of SUH ever resigned or had their membership revoked. The result of the intervenor's logic is that every individual who was ever a member of SUH still retains that status.
To illustrate the flaw in the intervenor's reasoning, one need only consider all the other past members of SUH who are no longer involved with the organization: Mr. Jones testified that every person who resided in an SUH transitional housing facility was also a member required to take on a responsibility. As transitional housing residents, it stands to reason that many or even most of those members eventually left SUH housing for other locations. However, no one could seriously argue that each of these residents retained their membership status months or even years after leaving an SUH facility and severing their ties to the organization.
Since commitment to SUH was the primary criterion for membership, logic and reason dictate that the only way to maintain membership in SUH was to show continued commitment. Any other view would create an ever-expanding roll of permanent members whose ties to the organization would become more and more tenuous with the passage of time. Such an interpretation of the by-laws which is essentially the one that the intervenor advocates would create an insurmountable obstacle to the continued operation of SUH and thus is to be avoided.
The intervenor has failed to show that any of the purported members it has identified actually expressed or demonstrated a continuing commitment to SUH after 1997. Thus there is no reason to conclude that any of them continued to be members as of 1999. Conversely, petitioner has adequately demonstrated that Louis Jones was the only remaining active and committed member of SUH in early May 1999. As a result, all the powers of membership devolved to Mr. Jones individually by that time. The membership resolutions May 23 and May [*8]26 removing the 1997 directors and electing a new board of directors, and directing the board to sell the property were therefore valid exercises of membership authority. Since the board of directors was properly constituted pursuant to a valid vote of the membership, its ratification of the membership resolutions was also valid.
The intervenor's remaining arguments, concerning the sufficiency of the mailings to the 1997 directors and the claim of undue influence by Housing Works are unsupported by the evidence before the Court. With respect to the former issue the Court simply notes that, pursuant to the by-laws, the terms of the 1997 directors had expired by 1999 and a validly constituted membership had the authority to elect a new board of directors, even without the courtesy of a letter of inquiry. Accordingly, it is
Ordered and adjudged that the petition is granted, and the sale of the premises at 162 West 130th Street, New York, New York to the Housing Works Harlem Housing Development Fund Corporation is approved, pursuant to Not-For-Profit Corporation Law §§ 510 and 511.
This constitutes the decision and judgment of the Court.
Dated: 10/16/03_______________________________________
 Lottie E. Wilkins, J.S.C.
Decision Date: October 16, 2003
Footnotes

Footnote 1: The corporation was originally named EMMAUS/Harlem Stand-Up, Inc. as indicated by its 1991 certificate of incorporation. In 1993, the certificate was amended to change the name to StandUp Harlem, Inc., presumably to reflect the withdrawal of the former organization from the project. The 1993 amendment did not change any other provisions of the original certificate of incorporation.

Footnote 2: The other properties have already been sold. This proceeding concerns only the last of the four properties

Footnote 3: After review pursuant to N-PCL § 511(b), the Attorney General's Charities Bureau has issued a "no objection" opinion with regard to the sale.

Footnote 4: Attorney Ross recalled that five directors served in 1997: Chuck Eaton, Doug Heilman, Cheryl James, Karen Washington and Louis Jones. 

Footnote 5: Mr. Jones testified that he lived in Pennsylvania during the relevant period.

Footnote 6: This action was taken, presumably, in the board's new capacity as sole member of the corporation.

Footnote 7: For example, the intervenor alleges that "after Stand-Up Harlem purchased the premises, they began operating a virtual crack house. There was loitering, noise, flagrant displays of open sexuality and constant vehicular congestion as result of drug trade that had evolved at the premises."

Footnote 8: The submissions indicate that the Homeowners Association has actively lobbied state and local agencies including the Office of the Governor as well as various legislators in support of its cause.